## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TANISHA SMITH, et al. | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-00232-RC |
| METRO TRANSIT POLICE DEPT., et al. | |
| Defendants. | |

### DECLARATION OF OFFICER NIGEL CRAWFORD-KINNEY

I, Officer Nigel Crawford-Kinney, make this Declaration on personal knowledge and information

available to me, and I am competent to testify to the matters contained herein.

1.      I am currently employed in the Metro Transit Police Department as a police

officer ("MTPD")

2.      MTPD is the police department for the Washington Metropolitan Area Transit

Authority ("WMATA").

3.      I and every other MTPD police officer are trained and certified as police officers

in three jurisdictions: Maryland, the District of Columbia and the Commonwealth of Virginia.

4.      I have been an MTPD officer for 5 years.

5.      During my time as an MTPD officer, I have made multiple arrests.

6.      My certification as a police officer requires that I have refreshers and updates in

the law and other matters involving my duties as a police officer; I have had many hours

pertaining use of force training by MTPD.

7.     On March 15, 2024, just before 6:00 p.m., I, along with Officer Anguisaca and Officer Artis, was at WMATA's Metro Transit Police Department's ("MTPD's") District Three police station which, at the time, was just across the street (it has since moved) from WMATA's Largo Metrorail station.

8.     At approximately 5:58 pm,  a call was broadcast from police communications about an active fight involving two females on the train at the Largo Metro Station in Largo Maryland.

9.     Officer Anguisaca, Artis and I both responded.

10.     Officer Artis drove her police car with Officer Anguisaca and I as passengers.

11.     Officer Anguisaca and I jumped out the car while Officer Artis parked the car.

12.     We ran into the station, where Officer Anguisaca spoke with the victim, A.I., who was near the Station Manager's kiosk inside the Largo station.

13.     I heard A.I. tell Officer Anguisaca that another woman, later identified as Tanisha Smith, assaulted A.I.

14.     I heard A.I. tell Officer Anguisaca that Smith punched her with a closed fist to the left eye, causing her to the ground,, and that Smith then placed her knee on A.I.'s chest, preventing A.I. from getting up and from breathing.

15.     A.I. described the assailant as a tall, black female in all blue clothing.

16.     Anguisaca broadcast over his police radio that the suspect was in all blue; soon after that broadcast, the Metro Integrated Control Center ("MICC"), which has operational oversight of station video cameras and monitors when officers need assitance, confirmed Smith's presence, on the station platform where the train was holding and describing her as being in all blue.

2

17.    I went up the steps inside the station to the platform to locate Ms. Smith.

18.    There was a train stopped on the platform and in car #7058, we observed Ms. Smith sitting on train seat, accompanied by her son, who appeared to be around 15-16 years old; no one else was in the train car.

19.    We took Ms. Smith by the arm and told her she needed to come with us.

20.    Ms. Smith started yelling and would not cooperate;  I then, along with Office Anguisaca, tried to handcuff Ms. Smith, but she resisted.

21.    Officer Anguisaca and I  both struggled with Ms. Smith on the train seat in order to handcuff her, during which time Ms. Smith's son, N.I.V., leaned over the car seat, trying to pull and push our arms away from his mother, as seen below in these two frames from Officer Artis' BWC video, Ex. 9 at 18:03:50, with Officer Artis' hand in the foreground:





22.     The son, N.I.V. is not allowed to interfere with our arrest, nor to physically push us away from his mother.

23.     We had to push N.I.V. away from us three or four times before Officer Artis entered the train car.

24.     Officer Artis witnessed N.I.V. grab our arms.

25.     Officer Artis used a single burst of O.C. (pepper) spray directed into the son's face to gain his compliance and keep him from interfering with handcuffing Tanisha Smith.



26.    Officer Artis and I handcuffed N.I.V., and because he was not walking, I pulled him out of the train car so the train could be placed back in service.

27.    N.I.V. would not stand and I initially I let him sit on the floor awhile I held onto his handcuffs, as seen below, in the single frame from Officer Artis' BWC, Ex. 9 at 18:04:51:



28.    However, I needed to call MTPD Police Communications to provide an update on the situation and to ask for a medic to check N.I.V. after his O.C. exposure.

29.    I stopped holding N.I.V.'s handcuffs two seconds later, to I could uses my hands for the police radio, as seen in the frame below from Ex. 9.at 18:04:53:



30.     I still needed to ensure I kept control of N.I.V. as an arrestee in my care and custody.

31.     I positioned myself so I stood over him where he was sitting on the ground on the platform and positioned my legs on the front and back of his torso, (first photo), with my right leg placed under his left thigh (second photo), as seen in the two BWC photos from Ex. 9 at 18:04:57-8:





32.    This position allowed me to have physical contact and control of N.I.V. while I attempted to call Police Communications on my radio and also to keep him upright and off the floor while he leaned against me.

33.    Less than a minute later, I led N.I.V. off the platform to go outside the station, as seen in the frame from Officer Artis' BWC below, Ex. 9 at 18:05:45:



34.    After everyone moved outside of the Metrorail station, the son was treated by Prince George's County medic 829, at MTPD's request, as part of MTPD standard procedure for O.C. exposure.

35.    Tanisha Smith told MTPD Lt. White when he arrived at the scene, that there was no family member or friend to whom MTPD could release N.I.V.

36.    N.I.V. assaulted Officer Anguisaca and me; however, MTPD officers use their discretion under General Order 350, (attached as Exhibit 16) to this motion, to place juveniles, like N.I.V, with another parent or guardian instead of processing him for a delinquent offense.

37.    Plaintiff would not provide the name of any family member or guardian who could take N.I.V., so he was turned over to the care and custody of P.G. Child Protective Services until his mother was released.

38.    Because I was working "plainclothes" that day, I did not have a body worn camera but was wearing my police badge.

9

39.     My struggle with Plaintiff Smith was significant enough that my radio antenna broke while Anguisaca and I tried to handcuff her against her resistance. A picture of the broken radio antenna is below, from Artis' BWC video. (Ex. 9 at 18:05:14)



40.     A significant fact in my determining probable cause is that A.I., went to the downstairs station manager's kiosk and stayed on site to give a report of what happened to her to the responding MTPD officers.   Ms. Smith stayed upstairs on the platform and in the train, apparently waiting for the train to leave.

41.     In my experience, the victim in any fight or assault is the one that makes the report and participates in the investigation; the instigator is usually the one that tries to leave.

**I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.**

Executed on August 2̲c̲ 2025

_____
**Officer Crawford**     8/24/25

10