**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TANISHA SMITH, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICE DEPARTMENT, *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:25-cv-0232 (RC) |

## MEMORANDUM OPINION

Lt. Louie White, Sgt. Wayne Tabb, Officer Tammie Artis, Officer Nigel Crawford-Kinney, Officer Christian Anguisaca, Sgt. Kendrick Anderson, and Sgt. Gerald Rich, Jr., whom plaintiffs sue in their official and individual capacities, are employed by the Metro Transit Police Department ("MTPD") of the Washington Metropolitan Area Transit Authority ("WMATA"). This matter is before the Court on the Personal Capacity Defendants' Motion for Dismissal and/or Summary Judgment (ECF No. 46). For the reasons discussed below, the Court GRANTS the motion.[1]

[1] In addition, the Court GRANTS plaintiffs leave to file Plaintiffs' Response in Opposition to Defendants' Motion for Sanctions and Request for Leave to File this Response (ECF Nos. 74 and 76). On consideration of these documents and plaintiffs' Notice of Clarification Regarding Count Six (ECF No. 73), and clarification that plaintiffs no longer pursue a default judgment on Count 6, the Court DENIES Plaintiffs' Motion for Default Judgment as to Count 6 Against Defendant Officer Crawford-Kinney (ECF No. 63).

## I. BACKGROUND

On March 15, 2024, Tanisha Smith and a woman, A.I., had an altercation on a subway train at or near the Largo Metro Station.[2] What precipitated the altercation was not clear. Nor was it clear which woman was the aggressor. A.I. represented that the situation was "a both of us thing." Defs.' Mem. (ECF No. 46-1), Ex. 10 (Rich BWC) at 18:05:21. Plaintiffs have presented a video recording which shows A.I. approaching Smith, who was standing with fists raised, and the two women standing chest to chest yelling at each other. It appeared that Smith "chest bumped" A.I., who pushed Smith away with both hands, at which point Smith grabbed A.I. by her hair, wrestled her to the floor, and held her there. According to A.I., Smith held her down in such a way that it was difficult for A.I. to breathe. *See* Rich BWC at 18:07:19, 18:09:31–34. In addition, according to A.I., Smith may have injured her left eye. *See id*. at 18:10:09–18:11:03.

"At approximately 5:58 p.m., a call was broadcast from police communications about an active fight involving two females on the train at the Largo Metro Station[.]" Defs.' SMF (ECF No. 46-3) ¶ 5. According to plaintiffs, the broadcast did not indicate "[t]he number of individuals involved and their gender(s)." Pls.' Resp. SMF ¶ 5. A recording of the broadcast, *see generally* Defs.' Mem., Ex. 12, reflected that the subway train was holding on Track 1 at the Largo Metro Station; that the victim was at the Largo Station; and that the suspect, wearing an "aqua blue or teal knee-length . . . hoodie" and accompanied by a male, remained on the platform.

---

[2] Plaintiffs initially alleged that the encounter with A.I. occurred at the Shady Grove Metro Station. *See* Compl. at 10-11. Plaintiffs since acknowledged their error, clarifying that they "boarded at Addison Road-Seat Pleasant station located on WMATA's Silver Line." Notice of Correction (ECF No. 70) ¶ 4 (emphasis removed). The altercation with A.I. occurred between the Addison Road and Morgan Boulevard stations, *see* Errata (ECF No. 71) ¶¶ 10-11, and plaintiffs' encounter with defendants occurred at the Largo Metro Station, *see id*. ¶ 11.

MTPD Officers Anguisaca, Crawford-Kinney and Artis, who were across the street from the Largo Metro Station at MTPD's District Three police station, Defs.' SMF ¶ 4, responded. They traveled to the Largo Metro Station in an MTPD vehicle driven by Artis. *Id.* ¶¶ 5-6. Artis was in uniform and wore "her MTPD-issued Body Worn Camera ('BWC')." Defs.' SMF ¶ 23; Artis Decl. (ECF No. 46-4) ¶ 41. Anguisaca and Crawford-Kinney "were working 'plainclothes' that day." Defs.' SMF ¶ 46; Pls.' Resp. SMF ¶ 46. They wore their police badges but had no BWCs. Defs.' SMF ¶ 46; Pls.' Resp. SMF ¶ 46.

Artis parked the vehicle while Anguisaca and Crawford entered the station. Defs.' SMF ¶ 7. Either at the Station Manager's kiosk, *see id.* ¶ 8, or standing just outside the station, *see* Pls.' Resp. SMF ¶ 8, Anguisaca and Crawford-Kinney encountered A.I., who "told Anguisaca that another woman, later identified as Tanisha Smith . . . , assaulted her," Defs.' SMF ¶ 9; *see* Anguisaca Decl. (ECF No. 46-5) ¶¶ 12-15. A.I. described her "assailant as a tall, black female in all blue clothing" who styled her hair "in 'baby locs.'" Defs.' SMF ¶ 11. "A.I. told Anguisaca that . . . Smith punched her with a closed fist to the left eye, causing her to fall to the ground, and that Smith then placed her knee on A.I.'s chest, preventing A.I. from getting up and from breathing." *Id.* ¶ 10; Anguisaca Decl. ¶ 14. Crawford-Kinney heard A.I. provide the suspect's description to Anguisaca. *See* Crawford-Kinney Decl. (ECF No. 46-6) ¶¶ 12-16.

At approximately 6:03 p.m., Defs.' SMF ¶ 13, "Anguisaca made a radio call on his police radio regarding the description of the assailant being in 'all blue,'" *id.* ¶ 12; *see id.* ¶ 13; Anguisaca Decl. ¶ 17; Pls.' Resp. SMF ¶ 13; *see generally* Defs.' Mem., Ex. 12. Anguisaca identified himself as "Tac 866," short for "Tactical" and his badge number, 866, and he was working in plainclothes. Defs.' SMF ¶ 14. Prompted by Anguisaca's broadcast, "Metro Integrated Control Center ('MICC'), which has operational oversight of station video cameras

and monitors when officers need assistance, confirmed Smith's presence[] on the station platform where the train was holding and describing her as being in all blue." Crawford-Kinney Decl. ¶ 16.

Smith described herself as brown in complexion, average in height, and claimed she "never wore baby locs in her life." Pls.' Resp. SMF ¶ 11. Rather, plaintiffs asserted that "Smith's head was religiously covered," *id*., and her hair did not become visible until Artis removed her head covering, *id*. And, according to plaintiffs, Smith "wore a black coat, a teal dress, black tights and black sneakers, not "all blue." *Id*.; *see id*. ¶¶ 12-13, 22, 25-26. Plaintiffs claimed that A.I. provoked the altercation: she approached Smith and struck Smith in her chest. *Id*. ¶ 10. Smith denied that "a closed fist to the left eye . . . cause[d A.I.] to fall," *id*., and that she "put her knee to [A.I.'s] chest," *id*.

Anguisaca and Crawford-Kinney entered the Largo Metro Station and proceeded to the train platform looking for a woman "in 'all blue.'" Defs.' SMF ¶ 15. "There was a train stopped on the platform and, in train car #7058, Anguisaca and Crawford observed . . . Smith sitting on [a] train seat, accompanied by a male, who they later determined was her son," N.I.V., *id*. ¶ 16, who was 13 years old, Pls.' Resp. SMF ¶ 16. Although defendants represented that "no one else was in the train car," Defs.' SMF ¶ 16, there was a third passenger "seated at the back of the train," Pl.'s Resp. SMF ¶ 16; *see* Artis BWC at 18:03:47.

According to defendants, Crawford-Kinney and Anguisaca approached Smith, took her by the arm, and instructed her to accompany them. *See* Defs.' SMF ¶ 17. According to Smith, the officers "silently approached . . . without providing any verbal communication or warning," Pls.' Resp. SMF ¶ 17, and Crawford-Kinney applied a handcuff to her left wrist "immediately

upon . . . entering the train" without giving a verbal command, Pls.' Resp. SMF ¶ 18; *see id.* ¶ 19.[3]

Defendants represented that Smith "pulled away" from the officers, and when Crawford-Kinney tried to handcuff Smith, she resisted. Defs.' SMF ¶ 18; *see* Anguisaca Decl. ¶ 22; Crawford-Kinney Decl. ¶ 20. Both Crawford-Kinney and Anguisaca "struggled with . . . Smith on the train seat, trying to handcuff her." *Id.* ¶ 18; Pls.' Resp. SMF ¶¶ 18-19.[4] The antenna on Crawford-Kinney's police radio was broken during the struggle. Defs.' SMF ¶ 20; Pls.' Resp. SMF ¶ 20.

Meanwhile, Artis "hear[d] over the police radio that the suspect [was] wearing 'all blue.'" Artis Decl. ¶ 11. She ran into the station and up to the platform where she heard "the sounds of yelling coming from the train closest to her." Defs.' SMF ¶ 24; *see* Artis Decl. ¶ 13. When Artis entered the train car, Anguisaca and Crawford-Kinney were standing over a woman "clad in a blue dress," Defs.' SMF ¶ 25; *see id.* ¶ 26, who "was struggling against the two officers[] attempting to handcuff her," Artis Decl. ¶ 15. Body camera footage showed Smith bent forward over a train car seat with Crawford-Kinney standing behind Smith to her left, and Anguisaca standing beside Smith to her right. *See* Artis BWC at 18:03:48-49. Crawford-Kinney's badge was visible. *See id.* Smith's right hand was behind her back, and both Crawford-Kinney and Anguisaca appeared to be holding Smith's left arm behind her, and handcuffs were tucked in the

---

[3] Plaintiffs refer to Smith's body-worn camera footage, designated Exhibit A, to support their claim that Anguisaca and Crawford-Kinney "silently approached [her] without providing any verbal communication or warning." Pl.'s Resp. SMF ¶ 17; *see id.* ¶¶ 18-19. Smith did submit video evidence on a USB flash drive, but only that of the fight between Smith and A.I., and Sgt. Tabb's BWC footage.

[4] Plaintiffs responded to, but did not dispute, defendants' factual proffer that "Smith pulled away from [Anguisaca and Crawford-Kinney]," Pls.' Resp. SMF ¶ 18, and that the officers "struggled with Ms. Smith on the train seat, trying to handcuff her," *id.* ¶ 19.

back of Anguisaca's waistband. *Id*. at 18:03:47–50. N.I.V., who had been seated directly behind Smith, grabbed or grabbed at Anguisaca's right arm. *Id*. at 18:03:50; Defs.' SMF ¶¶ 28, 30-31.

According to defendants, N.I.V. was "interfering with their handcuffing of . . . Smith." Defs.' SMF ¶ 28; *see* Anguisaca Decl. ¶¶ 24-26; Crawford-Kinney Decl. ¶¶ 21, 23. Plaintiffs denied that N.I.V. grabbed Crawford-Kinney's arm, *see* Pls.' Resp. SMF ¶¶ 28, 31, and admit N.I.V. "grabbed Anguisaca's arm with both of his hands . . . once," *id*. ¶ 31. N.I.V. "appeared upset by the events," Defs.' SMF ¶ 29, and was "confused" and "afraid," Pls.' Resp. SMF ¶ 29. Anguisaca "had pushed N.I.V. away from [Crawford-Kinney] and himself three or four times," Defs.' SMF ¶ 30, or perhaps just once, *see* Pls.' Resp. SMF ¶ 30.

Artis, who held O.C. spray in her right hand, Artis BWC at 18:03:50, sprayed N.I.V. in his face, *see id*.; Defs.' SMF ¶ 32.[5] Although BWC footage reflected a single burst, *see* Defs.' SMF ¶ 32; Artis BWC at 18:03:51, plaintiffs claimed that Artis sprayed N.I.V. twice, *see* Pls.' Resp. SMF ¶¶ 32, 35. Defendants represented that "Artis used . . . O.C. (pepper) spray directed into [N.I.V.'s] face to gain his compliance and keep him from interfering with . . . handcuffing . . . Smith." Defs.' SMF ¶ 32. N.I.V. "stopped grabbing at the officers' arms," *id*, ¶ 33, either because of the O.C. spray, *see id*., or because Anguisaca pushed him, *see* Pls.' Resp. SMF ¶ 33.

Anguisaca handcuffed Smith, *see* Artis BWC at 18:03:57, and escorted her out of the station and into a police vehicle, *see id*. at 18:05:41-18:07:44.[6] At that time Smith wore a black jacket over a blue knee-length dress, and the dress's hood covered her head. *See id*. at 18:05:54.

---

[5] Oleoresin capsicum spray ("O.C. spray") is also called "pepper spray." *See Taylor v. Roberts*, No. 24-cv-1643 (ABJ), 2026 WL 1139254, at *3 (D.D.C. Mar. 27, 2026).

[6] The parties dispute whether Anguisaca and Crawford-Kinney "caused a torn ligament in . . . Smith's right and left arms." Pl.'s SMF ¶ 43. According to defendants, Smith neither "exhibited . . . discomfort after her [arrest nor] mention[ed] any problem immediately after her arrest." Defs.' Resp. SMF ¶ 43. Smith allegedly spent "more than 30 minutes . . . sitting in the police car without making any complaint or reference to being hurt or in pain." *Id*. ¶ 20. Nor did Smith make a

Crawford-Kinney and Artis handcuffed N.I.V. *See id*. 18:04:09-31; Artis Decl. ¶ 29; Crawford-Kinney Decl. ¶ 26; Defs.' SMF ¶ 36; Pls.' Resp. SMF ¶ 36. According to Crawford-Kinney, because N.I.V. "was not walking," he "pulled [N.I.V.] out of the train car so the train could be placed back in service." Crawford-Kinney Decl. ¶ 26. Because "N.I.V. would not stand," *id*. ¶ 27, Crawford-Kinney had "him sit on the floor []while [Crawford-Kinney] held onto his handcuffs," *id*. In order to free his hands to call MTPD Police Communications with an update and request a medic to treat N.I.V. for O.C. exposure, Crawford-Kinney "stopped holding N.I.V.'s handcuffs," *id*. ¶ 28, and "stood over [N.I.V.] where [N.I.V.] was sitting on the . . . platform," *id*. ¶ 31, and placed his "legs on the front and back of [N.I.V.'s] torso, with [his] right [foot] placed under [N.I.V.'s] left thigh," *id*. Crawford-Kinney stated that that position "allowed [him] to have physical . . . control of N.I.V. while [he] attempted to call Police Communications on [his] radio and . . . keep [N.I.V.] upright and off the floor while [N.I.V.] leaned against him." *Id*. ¶ 32. "Less than a minute later, [Crawford-Kinney] led N.I.V. off the platform [and] outside the station," *id*. ¶ 33, and placed him in a separate police vehicle, *see* Artis BWC at 18:05:44-18:05:36, 18:08:23-18:09:11.

Defendants represented that Artis's use of pepper spray complied "with her training and MTPD standards because N.I.V. physically interfered with two officers' arrest and handcuffing of his mother, by grabbing and pulling at their arms." Defs.' SMF ¶ 34. Such use of pepper spray allowed the officers "to avoid a hand-to-hand struggle with a suspect, which helps prevent injuries to both the arrestees as well as to the officers." *Id*. ¶ 35. Plaintiffs contended that "N.I.V. was not a suspect, and did not pose a threat" to the officers. Pls.' Resp. SMF ¶ 35.

---

"request to go to the hospital." *Id*. Nevertheless, Smith apparently was taken to University of Maryland Capital Region Health's Emergency Department, treated, and returned to police custody. *See generally* Compl., Ex. M (ECF No. 1-1 at 3-10).

Pursuant to MTPD policy, "Artis notified police communications that O.C. had been deployed so that they could call a medic to check on N.I.V." Defs.' SMF ¶ 37; Pls.' Resp. SMF ¶ 37. "Prince George's County medic 829 treated [N.I.V.] as part of MTPD standard procedure for O.C. exposure, at the officers' request." Defs.' SMF ¶ 38. According to plaintiffs, treatment was delayed. Pls.' Resp. SMF ¶ 38.

Lt. White arrived after both Smith and N.I.V. had been handcuffed, *see* White Decl. (ECF No. 46-8) ¶ 7, and after Smith had been placed in a police vehicle, *see* Artis BWC at 18:07:44. He was present when Crawford-Kinney escorted N.I.V. out of the station, *see id*. at 18:08:27, and he instructed Crawford-Kinney to place N.I.V. in a separate police vehicle. *See id*. 18:08:30-32; Pls.' Resp. SMF ¶¶ 40-41. Sgt. Rich arrived after Smith and N.I.V. were handcuffed and as they were being escorted to police vehicles. *See* Rich Decl. (ECF No. 46-7) ¶¶ 7-8; Artis BWC at 18:06:54, 18:08:2. Lt. Tabb and Sgt. Anderson arrived on the scene after Smith and N.I.V. had been handcuffed and placed in police vehicles. *See* Tabb Decl. (ECF No. ¶ 46-9) ¶ 7; Anderson Decl. (ECF No. 46-10) ¶ 7. Neither White, Rich, Tabb, nor Anderson was involved in the handcuffing or arrest of Smith and N.I.V., and none is alleged to have used force against plaintiffs. Defs.' SMF ¶ 41.

Sgt. Rich interviewed A.I., *see* Rich Decl. ¶ 12; *see generally* Rich BWC, who stated she did not want to press charges against Smith, *see id*. at 18:27:26-27, 18:27:38-40. According to plaintiffs, Sgt. Rich told Sgt. Anderson to have A.I. fill out a form, and shouted to A.I., "we'll tell you what to write!" Pls.' Opp'n ¶ 20. Sgt. Anderson took the form from Sgt. Rich and handed it to A.I. who was seated in Anderson's vehicle. *See* Pls.' Resp. SMF ¶ 41; Pls.' SMF (ECF No. 60) ¶ 26. Yet Anderson was "never seen communicating with [A.I.] at all." *Id*. Further, plaintiffs claimed, A.I. was "seen handing a signed 'victim statement' to Sgt. Rich from Sgt.

Anderson's Patrol Vehicle," Pls.' Opp'n at 11 ¶ 18; *see* Defs.' Resp. SMF (ECF No. 66-1) ¶ 26, and in turn, Sgt. Rich handed the document to Anguisaca," Pls.' Opp'n at 11 ¶ 19; *see* Pls.' SMF ¶ 29.

Plaintiffs characterized A.I.'s statement as a "fabricated" statement "to cover [Anguisaca's] wrongful actions." Pls.' SMF ¶ 29. While the parties have not produced A.I.'s statement as an exhibit, presumably its contents were incorporated into the Event Report Anguisaca wrote, *see generally* Defs.' Mem., Ex. 15 (ECF No. 46-17), and the Statement of Probable Cause Anguisaca prepared for the District Court of Maryland for Prince George's County, *see* Compl., Ex. L (ECF No. 1-1) at 12.

Defendants represented that it was "standard procedure to have a complaining witness fill out a form related to a criminal assault." Defs.' Resp. SMF ¶ 26. It did not matter "whether A.I. wished to 'press charges' at that moment," *id.*, and at any rate, Sgt. Rich "already had A.I.'s voluntary statement on BWC prior to A.I. filling out the form," *id.* Sgt. Rich denied having "change[d] any information that A.I. [provided, or having] fabricate[d] any information." Rich Decl. ¶ 13.

According to defendants, although N.I.V. assaulted Anguisaca and Crawford-Kinney, MTPD chose not to charge N.I.V. with a juvenile offense. *See* Defs.' SMF ¶ 44. Rather than "processing him for a delinquent offense," *id.* ¶ 43, under General Order 350, the officers could have placed N.I.V. in the custody of a parent or guardian, *see id.* Lt. White asked Smith into whose custody MTPD could release N.I.V. Defs.' SMF ¶ 42; Pls.' Resp. SMF ¶ 42. Smith "would not or could not provide the name of any family member or guardian who could take N.I.V." Defs.' SMF ¶ 45. According to Smith, who insisted N.I.V. had been falsely accused, Lt. White disregarded her wish to release N.I.V. to the custody of his father, Pls.' Resp. SMF ¶ 42,

who "was only two and a half to 3 hours away by plane," *id.* ¶ 45; *see* Artis BWC at 18:18:19-31. MTPD "turned [N.I.V.] over to the care and custody of P.G. Child Protective Services until his mother was released." Defs.' SMF ¶ 45.

Defendants represented that, "[i]n assessing . . . probable cause to arrest Tanisha Smith, both Anguisaca and Crawford[-Kinney] considered, in addition to all the other facts and other information that they knew, the fact that A.I. waited downstairs with the station manager by the station entrance to talk to MTPD about what happened, while . . . Smith stayed upstairs on the train platform waiting for the train to leave the station." Defs.' SMF ¶ 47. To defendants, it "appeared . . . to be an attempt by . . . Smith to flee the scene." *Id.* ¶ 48. Smith characterized her actions as "simply continu[ing] on [their] journey" into the District of Columbia, Pls.' Resp. SMF ¶ 48, and opined that "staying on the train and continuing to their destination[] was not a crime," *id.* ¶ 47.

## II. LEGAL STANDARDS

### A. Rules 8 and 12(b)(6)

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" by asking whether a plaintiff has properly stated a claim on which relief can be granted. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In deciding a motion to dismiss under Rule 12(b)(6), the Court must consider the whole complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court may disregard "inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Kowal*, 16 F.3d at 1276).

To survive a motion to dismiss, a plaintiff must provide "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S at 570). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Id*. In determining a 12(b)(6) motion to dismiss, the Court may consider "only the facts alleged in the complaint [and] any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Equal Employment Opportunity Comm'n v. St. Francis Xavier Parochial Sch*., 117 F.3d 621, 624 (D.C. Cir. 1997).

The Court, however, will construe a *pro se* complaint liberally and hold it "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Court may thus "examine other pleadings to understand the nature and basis of . . . *pro se* claims" as alleged in the complaint. *Gray v. Poole*, 275 F.3d 1113, 1115 (D.C. Cir. 2002). Nevertheless, a *pro se* plaintiff is not excused from adhering to the applicable procedural rules and must "plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'" *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681–82 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678–79). Despite the liberality afforded *pro se* complaints, the Court "need not accept inferences unsupported by the facts alleged in the complaint or 'legal conclusions cast in the form of factual allegations.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008) (quoting *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.D.C. 1994)).

**B. Rule 56**

Courts may grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [or] interrogatory answers[, or by] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

A material fact is one which "might affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine dispute about material facts, the Court must view the evidence in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor. *See id.* at 255; *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)) (internal quotation marks omitted). Therefore, courts "do not determine the truth of the matter, but instead decide only whether there is a genuine issue for trial." *Id*. "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute does not bar summary judgment, however. *See Liberty Lobby*, 477 U.S. at 248. The nonmoving parties must show more than "[t]he mere existence of a scintilla of evidence in support of the plaintiff[s'] position. *Id*. at 252. Rather, "there must be evidence on which the jury could reasonably find" in their favor. *Id*. Unsupported allegations or conclusory statements are not sufficient to defeat summary judgment. *See Ass'n of Flight Attendants*, 564 F.3d at 465-66; *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

The district court may not make credibility determinations or weigh the evidence. *Liberty Lobby*, 477 U.S. at 255. Rather, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Id*. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249– 50 (citation modified).

## III. DISCUSSION

### A. Official Capacity Claims

Plaintiffs sue these defendants in both their official and individual capacities, *see* Compl. at 3-5, and defendants move to dismiss the official capacity claims, *see* Defs.' Mem. at 6-7 (page numbers designated by CM/ECF). For the same reasons the Court dismissed plaintiffs' official capacity claims against General Manager Randy Clarke, Board Chair Valarie Santos, and MTPD Chief Michael Anzallo, *see* Mem. Op. and Order (ECF No. 79), the Court dismisses plaintiffs' official capacity claims against defendants White, Tabb, Artis, Crawford-Kinney, Anguisaca, Anderson and Rich.

### B. Individual Capacity Claims

#### 1. Counts Construed Under the Fourth Amendment

Plaintiffs title certain counts of their complaint as follows:

- Count 1: Failure to Investigate, 42 U.S.C. § 1983 (Violation of Fourteenth Amendment, Deprivation of Rights)
- Count 2: False Arrest, 42 U.S.C. § 1983 (Fourth Amendment Violation, Deprivation of Rights)
- Count 3: Excessive Force, 42 U.S.C. § 1983 (Fourteenth Amendment Violation of Due Process)
- Count 4: Assault and Abuse of a Minor, 42 U.S.C. § 1983 (Fourteenth Amendment Violation of Due Process)
- Count 5: Unlawful Detention of a Disabled Minor, 42 U.S.C. § 1983 (Fourteenth Amendment Violation of Due Process)
- Count 6: Sexual Assault, 42 U.S.C. § 1983 (Fourteenth Amendment Violation of Bodily Integrity)
- Count 8: Wrongful Detention, 42 U.S.C. § 1983 (Fourteenth Amendment Violation of Due Process)

*See* Compl. at 18-28, 30.[7] Defendants argue that these Counts "must be construed solely under the Fourth Amendment." Defs.' Mem. at 9.

---

[7] In Count 9, plaintiffs allege that defendants "unlawfully detained N.I.V. and removed him from the train in handcuffs and transported him without proper legal justification, violating the

Plaintiffs respond that their claims are not limited to the Fourth Amendment, and argue that, because defendants "forcibly separated" Smith from N.I.V., there is a separate cause of action "under the Fourteenth Amendment's substantive due process framework," with respect to plaintiffs' "parent–child relationship . . . which is distinct and not subsumed by their seizure claims," Pls.' Opp'n at 3. According to plaintiffs, "state officials may not separate a parent and child absent imminent danger or lawful necessity." *Id*. at 9. Plaintiffs neither establish the duration of Smith's separation from N.I.V. nor plausibly allege that their separation was excessively long. And given Smith's arrest, it is not reasonable for N.I.V. to have accompanied Smith pending her release from custody. This is not, for example, a situation where government officials sought to terminate Smith's parental rights, which would implicate the Due Process Clause of the Fourteenth Amendment. *See Santosky v. Kramer*, 455 U.S. 745 (1982). Plaintiffs simply do not make out a plausible Fourteenth Amendment claim.

The Court concurs with defendants' assessment that "[t]he constitutional rights asserted . . . in these § 1983 claims must be sought ultimately in the [F]ourth [A]mendment . . . [f]or it is from the Fourth Amendment and its common-law antecedents' that the standards and procedures for arrest and detention have been derived." Defs.' Mem. at 8 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1974)). And "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free

federal kidnapping statute," Compl. at 31, that is, 18 U.S.C. § 1201. Defendants move to dismiss Count 9, arguing that the federal kidnapping statute "does not provide a private cause of action." Defs.' Mem. at 9. Plaintiffs respond that their intent is not to invoke the statute, explaining that they "do not seek criminal prosecution[.]" Pls.' Opp'n at 9. Rather, plaintiffs consider Count 9 "properly framed [as] a § 1983 seizure claim." *Id*. at 10. On this point, the parties agree. And as defendants point out, N.I.V.'s unlawful detention is alleged in Counts 5 and 8. *See* Defs.' Mem. at 9. Plaintiffs' kidnapping claim is dismissed.

citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).

**2. Defendants White, Tabb, Anderson, and Rich**

Defendants White, Tabb, Anderson, and Rich move for dismissal and/or summary judgment in their favor. *See* Defs.' Mem. at 12. Aside from "general assertions," they argue, plaintiffs neither refer to them in the complaint nor "assert a cognizable claim against them." *Id*. Plaintiffs counter that these defendants had a duty to intervene and failed to do so, such that they are liable "even if they did not personally apply force." Pls.' Opp'n at 16 ¶ 33; *see id*. at 16 ¶ 34. In addition, plaintiffs argue that Lt. White and Sgt. Rich "not only knew [p]laintiffs were being unlawfully seized – they directed and perpetuated it," *id*. at 16-17 ¶ 35 (emphasis removed), such that supervisory liability applies.

Plaintiffs' position is untenable based on the materials the parties have submitted. The record demonstrates that neither Lt. White nor Sgt. Rich handcuffed plaintiffs or otherwise participated in the arrest. Having arrived on the scene *after* plaintiffs' arrests, plaintiffs cannot demonstrate that Lt. White or Sgt. Rich could have intervened in the arrests themselves, whether or not obliged to do so, or could have used force against plaintiffs. The same goes for Sgt. Tabb and Sgt. Anderson. Plaintiffs neither allege facts nor point to materials in the record demonstrating that either engaged in plaintiffs' arrest or used force against them.

Absent factual allegations plausibly alleging that Lt. White, Sgt. Rich, Sgt. Tabb and Sgt. Anderson personally participated in plaintiffs' arrests, claims against these defendants are dismissed. *See, e.g., Proctor v. District of Columbia*, No. 18-cv-0701 (TNM), 2018 WL 6181739, at *5 (D.D.C. Nov. 27, 2018) (dismissing claims against Deputy Mayor in her

individual capacity where "Plaintiffs fail to allege that [she] was directly responsible for any constitutional deprivation"); *Swinson v. D.C. Metro Police Dep't*, No. 08-cv-0809 (RMU), 2009 WL 1327225, at *2 (D.D.C. May 12, 2009) (concluding that complaint which failed to allege "Mayor's personal involvement in the alleged wrongdoing" failed to state a claim against him in his personal capacity), *aff'd*, No. 09-5202, 2010 WL 288798 (D.C. Cir. Jan. 7, 2010).

**3. Defendants Anguisaca, Crawford-Kinney and Artis**

Defendants Anguisaca, Crawford-Kinney and Artis move for summary judgment, arguing that they are entitled to qualified immunity from suit. *See generally* Defs.' Mem. at 14-29.

**a. Qualified Immunity**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Such "immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and when it is "properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection is afforded to police officers regardless of whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citations and internal quotation marks omitted); *see also Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which confront

officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.").

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step analysis for resolving qualified immunity claims by government officials. First, the Court decides "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 201. "If the court determines that there is no such violation, the analysis is over and the officer is entitled to qualified immunity." *Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 21 (D.D.C. 2009). If a plaintiff satisfies this first step, the Court next decides whether the right at issue was clearly established at the time of the defendants' alleged misconduct. *Saucier*, 533 U.S. at 201. The sequence of the analysis is not mandatory, and the Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Once a defendant asserts a qualified immunity defense, plaintiffs' burden of proof is "to show that the official is not entitled to qualified immunity." *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 388 (D.D.C. 2016) (citations omitted), *appeal dismissed sub nom. Kyle v. Davis*, No. 16-7040, 2016 WL 6915562 (D.C. Cir. Oct. 26, 2016). They "must show not only that an official violated a constitutional right but also that the right was clearly established at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (citation and internal quotation marks omitted). "To decide the issue of whether or not the non-movant may survive summary judgment – *i.e.*, whether he has provided enough evidence that a reasonable jury could return a verdict in his favor – the court must first identify the version of events that best comports

with the summary judgment standard and then ask whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Kyle*, 177 F. Supp. 3d at 389 (internal quotation marks and citations omitted).

Where, as here, the question of qualified immunity is presented on summary judgment and where the parties' versions of events differ, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing" the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and citations omitted); *see Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (finding that Fifth Circuit "failed to view the evidence at summary judgment in the light most favorable to [the plaintiff]" by improperly weighing the evidence and resolving disputed issues in the moving party's favor); *Pitt v. District of Columbia*, 558 F. Supp. 2d 11, 16 (D.D.C. 2008) ("In assessing whether a party is entitled to qualified immunity, the facts must be taken in the light most favorable to the party asserting the constitutional injury."). "[T]his usually means adopting . . . the plaintiff[s'] version of the facts," *Scott*, 550 U.S. at 378, and "[q]ualified immunity cannot be granted on summary judgment . . . if there is a genuine issue as to a material issue of fact," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006).

**b. False Arrest**

Anguisaca, Crawford-Kinney and Artis construe Counts 1, 2, 5, and 8 as assertions they lacked "probable cause to believe that [Smith] committed the crime of assault when she was fighting another passenger and that N.I.V. assaulted two officers and obstructed them in the arrest of his mother." Defs.' Mem. at 17. These defendants argue that they did have probable cause for arresting plaintiffs and, therefore, they did not violate plaintiffs' Fourth Amendment rights. *See generally id*. 17-22.

The Fourth Amendment protects "the right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless arrest—i.e., a 'seizure'—is reasonable if 'there is probable cause to believe that a criminal offense has been or is being committed.'" *Richards v. Gelsomino*, 814 F. App'x 607, 609 (D.C. Cir. 2020) (per curiam) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Thus, a police officer accused of false arrest "may defend on the merits by proof . . . that the arrest was made in good faith, with probable cause, under a statute he reasonably believed to be valid." *Wade v. District of Columbia*, 310 A.2d 857, 862 (D.C. 1973) (citing *Pierson v. Ray*, 386 U.S. 547 (1967)); *see Saidi v. Washington Metro. Area Transit Auth.*, 928 F. Supp. 21, 27 (D.D.C. 1996) ("[T]o successfully establish a defense of qualified immunity to a charge of false arrest, the WMATA police must show probable cause existed for the arrest of the plaintiff.") (citations omitted); *see also Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993) ("Where, as here, a false arrest claim is based on a warrantless arrest, the defendant officers must establish probable cause to arrest.").

"Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It "requires more than bare suspicion, but less than a preponderance of the evidence." *Lin v. District of Columbia*, 47 F.4th 828, 840 (D.C. Cir. 2022) (quoting *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016)) (internal quotation marks omitted). "To determine whether an officer had probable cause for an arrest," the Court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Wesby*, 583 U.S. at 56-57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (additional citation omitted); *see Devenpeck*, 543 U.S. at 152 ("In

conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). The officers' "subjective state of mind is irrelevant to the inquiry." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 19 (D.D.C. 2011) (citing *Devenpeck*, 543 U.S. at 153). "[S]o long as the arresting officer has 'a good faith, reasonable belief' that probable cause exists, then she is still entitled to qualified immunity." *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 186 (D.D.C. 2017) (quoting *Saidi*, 928 F. Supp. at 27). Based on the parties' submissions, the Court concludes that defendants had probable cause to arrest Smith and N.I.V.

Anguisaca, Crawford-Kinney, and Artis had heard the police radio broadcast that two passengers were fighting on a train at the Largo Metro Station, and "fighting" reasonably would have brought to mind assault and battery, criminal offenses under both District of Columbia and Maryland law. *See United States v. Redrick*, 841 F.3d 478, 485 (D.C. Cir. 2016); *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 107 (D.D.C. 2011); *see also Garcia v. Montgomery Cnty., Maryland*, 145 F. Supp. 3d 492, 521 (D. Md. 2015) (describing "second-degree assault [as] Maryland's catch-all crime for assaults that are not committed with a firearm or which do not involve intent to cause serious physical injury") (citing Md. Code Ann. Crim. L. §§ 3–202, 3–203); *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (defining "assault . . . as an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim," and "battery" as "an intentional act that causes a harmful or offensive bodily contact").

Defendants had reason to believe that Smith was the suspect for whom they were looking. Based on the initial police radio broadcast and Anguisaca's interview with A.I.,

defendants sought a woman dressed in blue, and MICC confirmed the presence of a woman dressed in blue on the platform of the Largo Metro Station. Smith's clothing closely matched that description even if she also wore black tights under a blue dress, and a black jacket over the dress, and notwithstanding the parties' dispute over whether Smith wore "all blue," aqua blue, or teal. There were three passengers on that train car, and Smith was the only passenger wearing a shade of blue approaching aqua or teal. Also factoring into defendants' calculus was Smith's failure to cooperate when Anguisaca and Crawford-Kinney initially approached her, their belief that Smith was suspected of having assaulted a fellow Metro passenger, and her active resistance to the officers' efforts to handcuff her.

With respect to N.I.V., plaintiffs' claim is even weaker. Plaintiffs concede that N.I.V. grabbed, grabbed at, pushed and/or pulled Anguisaca's arms. Video footage and defendants' declarations support defendants' position that N.I.V. similarly grabbed Crawford-Kinney's arms. N.I.V. is seen not only engaging in assaultive behavior in the arresting officers' presence, but also making two of the three officers his victims. N.I.V.'s conduct reasonably could be construed as assault and, under Maryland law, obstructing and hindering a police officer performing his duties. *See Titus v. State*, 32 A.3d 44, 50 (Md. 2011) (citing *Cover v. State*, 466 A.2d 1276 (1983) and discussing "four-part test for analyzing the offense of obstructing and hindering a police officer in the performance of his duty").

Smith faulted defendants for "failing to conduct an[] investigation . . . and . . . deliberately disregarding readily available exculpatory evidence." Pls.' Opp'n at 19 ¶ 42. Rather than questioning her or "examin[ing] evidence offered at the scene," *id*. at 19 ¶ 41; *see id*. at 19 ¶ 43, defendants took action "based solely on hearsay from an unvetted third party," *id*. at 19 ¶ 41, presumably a reference to A.I. But defendants need not have conducted an

investigation, or evaluated Smith's proffered evidence, or explored her claimed innocence, on the spot. Defendants were not obligated to determine whether Smith assaulted A.I., to determine whether A.I. assaulted Smith, or to verify Smith's claims of innocence prior to arresting her. *See Wesby*, 583 U.S. at 61 (noting that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"); *Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014) ("Once a police officer has a reasonable basis for believing there is probable cause, [she] is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.") (citation omitted and brackets in original); *Williams*, 268 F. Supp. 3d at 187 (concluding that police officers who had probable cause to believe plaintiff committed assault were not required by the Fourth Amendment to interview him to investigate possible innocence before making the arrest); *see also Black v. District of Columbia*, 480 F. Supp. 2d 136, 139 (D.D.C. 2007) ("[T]he law is clear that a failure to investigate a suspect's alibi does not negate probable cause."). Further, defendants need not have been witnesses to the assault. Their reliance on A.I.'s statement was reasonable under the circumstances, *see Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir. 1968) (per curiam) ("It is enough that the police officer initiating the chain of communication either had firsthand knowledge or received his information from some person— normally the putative victim or an eye witness— who it seems reasonable to believe is telling the truth."), as was their reliance on information communicated via police radio, *see Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 592 (D.D.C. 2018) (finding it "perfectly reasonable for officers to rely on the information furnished to them by a dispatcher in the ordinary course, even if that information turns out to be incorrect").

**c. Excessive Force**

Defendants construe Counts 3 and 4, alleging they "physically restrained . . . Smith, and violently twisted her arms," Compl. at 22, and "used OC spray on . . . N.I.V.," *id*., as excessive force claims, *see* Defs' Mem. at 4.[8] Anguisaca, Crawford-Kinney and Artis argue the force used was objectively reasonable. *See generally id*. at19-25.

"In general, police officers have authority to use some degree of physical coercion when subduing a suspect, as long as the amount of force used is reasonable." *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (internal citation and quotation marks omitted). This is an objective standard, *Graham*, 490 U.S. at 397, and the Court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *id*. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)) (internal quotation marks omitted). The officer's "underlying intent or motivation . . . is not considered; the only issue is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him." *Rogala v. District of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998) (quoting

---

[8] In Count 6, plaintiffs allege Crawford-Kinney committed sexual assault by "wedging his foot between N.I.V.'s legs, causing sexual discomfort and humiliation." Compl. at 27. BWC footage does not support this assertion. N.I.V. is seen seated on his heels on the platform while Crawford-Kinney let go of the handcuffs around N.I.V.'s wrists and used his legs to hold N.I.V. upright – one foot is behind N.I.V. and the other is placed between N.I.V.'s thighs. Crawford-Kinney neither touches N.I.V.'s groin with his foot or leg nor touches N.I.V.'s thighs or groin with his hands. In short, Crawford-Kinney engages in no behavior that reasonably could be considered sexual in nature, and Count 6 is dismissed.

*DeGraff v. District of Columbia*, 120 F.3d 298, 301 (D.C. Cir. 1997)) (internal quotation marks omitted). "When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017). Rather, an officer can be held liable only "if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Rogala*, 161 F.3d at 54.

Here, defendants had reason to believe that Smith had assaulted another Metro passenger, and that a struggling Smith posed a threat to Anguisaca and Crawford-Kinney. The undisputed fact that plaintiffs remained on the train platform to continue their journey reasonably could have been construed as plaintiffs' attempt to flee. Plaintiffs did not deny that Smith "pulled away" from the officers and "resisted" when Crawford-Kinney tried to handcuff her, Pls.' Resp. SMF ¶ 18, and that the officers "struggled with [her] on the train seat trying to handcuff her," *id.* ¶ 19.

Without question, Anguisaca and Crawford-Kinney used physical force against Smith. The officers' actions – using their bodies to hold Smith still, twisting her arms behind her back, and placing handcuffs around Smith's wrists – were reasonable actions calculated to subdue a resisting suspect. The amount of force Anguisaca and Crawford-Kinney used in this circumstance objectively was reasonable. Video footage showed that the officers held Smith down, and as soon as they placed handcuffs on both of Smith's wrists, the officers ceased to apply force. While "[t]he use of force on a suspect who has already been subdued is plainly excessive," *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 141 (D.D.C. 2017), *appeal dismissed*, No. 17-7074, 2017 WL 5157752 (D.C. Cir. Oct. 31, 2017); *see Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (concluding that a "reasonable officer would not have repeatedly kicked [a] surrendering suspect in the groin"); *Johnson v. District of Columbia*,

725 F. Supp. 3d 62, 70 (D.D.C. 2024) (concluding that police officer who "us[ed] force against Plaintiff when he was already subdued and presented no danger to the public or to the officers" was not entitled to qualified immunity), *recons. denied,* No. 22-cv-3764 (TSC), 2024 WL 4467146 (D.D.C. Oct. 10, 2024), Smith was not subjected to such treatment. At any rate, cases in the D.C. Circuit have held that far more forceful actions by police officers in handcuffing suspects does not run afoul of the Fourth Amendment. *See Cromartie v. District of Columbia*, 479 F. App'x 355, 357 (D.C. Cir. 2012) (per curiam) (concluding that slamming suspect to the ground, handcuffing suspect, and forcibly keeping suspect on the ground "was no more than the ordinary 'degree of physical coercion' used by police officers to effectuate an arrest, especially in light of the fact that Cromartie's belligerence and disobedience suggested he might try to resist or escape"); *Oberwetter*, 639 F.3d at 555 (concluding that officer who shoved plaintiff against a pillar and violently twisted her arm, "[g]iven that some force may have appeared reasonably necessary, [the officer's] alleged actions were not markedly different from what we would expect in the course of a routine arrest"); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (finding "it . . . reasonable for [police officer] to apply force to [plaintiff's] arm to secure his compliance during arrest"); *Goolsby*, 317 F. Supp. 3d at 594-95 (finding officer who slammed fleeing suspect to the ground and twisted his arms causing pain entitled to qualified immunity, as "reasonable officer could have concluded the use of force alleged here was reasonable"); *Jackson v. District of Columbia*, 83 F. Supp. 3d 158, 170 (D.D.C. 2015) (noting that "the action of pulling a person out of his or her car, bending the person's arm behind his or her back, and applying pressure . . . is regularly found not to be excessive force for effectuating an arrest"); *Robinson v. District of Columbia*, No. 03-cv-1455 (RCL), 2006 WL 2714913, at *4 (D.D.C. Sept. 22, 2006) (finding police officer who "pushed plaintiff and shoved him onto the hood of his car, and held

[him' down while putting the handcuffs on [his] wrists . . . tightly enough to cause swelling and abrasions" was entitled to qualified immunity, even though "[t]he crimes plaintiff was suspected of having committed were not violent crimes" and "[n]othing in the record suggests that plaintiff resisted arrest, posed a threat to the officers' safety or to the safety of any bystanders, or attempted to flee the scene"); *see also Jackson v. District of Columbia*, No. 21-cv-1475 (RC), 2024 WL 4144118, at *5 (D.D.C. Sept. 11, 2024) (discussing "cases suggest[ing] that when an officer pushes an arrestee into a wall, pillar, or similar object during the course of a routine arrest, in a manner that does not cause injury, the officer does not engage in excessive force"), *appeal dismissed sub nom. Jackson v. Gov't of the District of Columbia*, No. 24-7142, 2026 WL 839854 (D.C. Cir. Feb. 26, 2026); *Paylor v. District of Columbia*, No. 22-cv-3359 (JEB), 2024 WL 1050336, at *10 (D.D.C. Mar. 11, 2024) (noting that "it is well established that short-lived, minimal uses of force deployed to facilitate handcuffing a resisting arrestee . . . are reasonable under the Fourth Amendment"); *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 88 (D.D.C. 2015) (citing cases for the proposition that "officers' use of force, including the use of handcuffs, batons and a tactical takedown to lower the plaintiff to the ground when he was noncompliant with commands and appeared to be resisting arrest, was not excessive").

With respect to N.I.V., the parties do not dispute that defendants used force against him: Anguisaca pushed N.I.V. away while attempting to handcuff Smith and Artis used O.C. spray. N.I.V. is seen in the video grabbing or grabbing at Anguisaca's arms, and it is reasonable for Anguisaca and Crawford-Kinney to have construed N.I.V.'s behavior as assault and interfering with Smith's arrest. Further, it is reasonable for Artis, who witnessed Smith's resistance and N.I.V.'s grabbing at Anguisaca's arms, to conclude that use of O.C. spray would cause N.I.V. to cease interfering with the arrest and prevent further assault on her fellow officers. The O.C.

spray had its intended effect – N.I.V. immediately withdrew his hands and used them to cover his eyes.

Defendants note the lack of case law in the D.C. Circuit holding "that the use of [O.C.] spray . . . on an assaultive and restrained suspect is a constitutional violation." Defs.' Mem. at 28. "In turning to other circuits throughout the country, however, a governing principle does emerge: the use of pepper spray becomes unreasonable where it is deployed against a restrained and compliant individual." *Wilkins v. District of Columbia*, No. 17-cv-0884 (CKK), 2020 WL 5816591, at *12 (D.D.C. Sept. 30, 2020) (citing *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020)) (additional citations omitted). Such is not the case with N.I.V., whose noncompliance is seen on video and who was not subjected to O.C. spray or further force of any kind after he was subdued.

**C. Count 7: Fabrication of Evidence and Coercion**

In Count 7, plaintiffs allege that defendants "coerced [A.I.] into providing a fabricated statement, resulting in false charges and wrongful detention [of] [p]laintiffs," Compl. at 28, even though A.I. notified defendants "at least four separate times," Pls.' Opp'n ¶ 18, she did "not wish to press charges," *id.*; *see* Pls.' Resp. SMF ¶ 41. Defendants argue that the complaint's factual allegations fail to state a fabrication-of-evidence claim, *see* Defs.' Mem. at 10, noting that Smith "does not name which officer(s) 'coerced' the victim, or how the coercion occurred, or which statements were false, or how the alleged fabrications caused false charges." *Id.* Defendants note, too, Smith "was sitting in a police cruiser at the time" Sgt. Rich interviewed A.I., *id.*, and

any evidence to support her claim "would have come from BWC videos, which do not support her claims," *id.*[9]

A fabrication of evidence claim is treated as a substantive due process claim arising under the Fifth Amendment to the United States Constitution. *See Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 160 (D.D.C. 2020) (evaluating "fabrication-of-evidence claim[] as matter[] of substantive due process"). "This due process right emanates from the long-acknowledged 'principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction."' *Wilkins*, 2020 WL 5816591, at *14 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "In order to establish a substantive due process claim, a plaintiff must show that the state actor was deliberately indifferent to his constitutional rights such that the conduct 'shocks the conscience.'" *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9 (D.D.C. 2011) (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006)). "The conscience-shock inquiry is a threshold question in a due process challenge to executive action." *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (citation and internal quotation marks omitted). This "standard sets a high bar," *Wilkins*, 2020 WL 5816591, at *15, and "only government action that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience qualifies as arbitrary for the purposes of substantive due process," *Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020)

---

[9] Plaintiffs accuse defendants of "spoliation," blaming them for plaintiffs' inability to produce evidence supporting their claim that evidence had been fabricated. *See* Plaintiff's Motion for Rule 45 Subpoena to Axon, Forensic Extraction of Digital Evidence, and Sanctions for Deliberate Suppression of Body-Work Camera Footage (ECF No. 61) at 2. They contend that defendants "selectively disclosed" BWC footage, *see id*. at 10, and complain of "mid-sentence openings, abrupt deactivations, and conveniently missing pre-activation buffers," *id*.; *see id*. at 6-8. Because the fabrication of evidence claim fails, the Court denies plaintiffs' motions (ECF No. 61 and duplicate, ECF No. 65) for discovery and sanctions.

(citations and internal quotation marks omitted). "Negligence alone is insufficient to establish a claim under § 1983." *Molina-Aviles*, 824 F. Supp. 2d at 10 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (additional citation omitted).

Plaintiffs' factual allegations come nowhere close to demonstrating conduct that shocks the conscience, such that they fail to state a plausible fabrication of evidence claim. At best their allegations are conclusory. Even if plaintiffs had managed to state a claim, it would not survive summary judgment. Plaintiffs point to no materials in the record tending to show that any defendant was deliberately indifferent to plaintiffs' constitutional rights, or that defendants knew A.I. supplied incorrect information and still presented that information in bad faith. *See Riddle v. Riepe*, 866 F.3d 943, 948 (8th Cir. 2017) (rejecting argument that incident report written by officer who "did not see or hear the events described therein" was "evidence of fabrication" as "[i]t is not improper, and certainly not evidence of fabrication, for an officer to rely on hearsay to establish the facts to support an arrest or charge."). And having reviewed the parties' proffered evidence, including BWC footage of Sgt. Rich's interview of A.I., plaintiffs fail to demonstrate that A.I.'s written statement – obtained *after* plaintiffs' arrests – could have caused their arrests, and plaintiffs point to no evidence supporting their assertion that "fabrication occurring after arrest . . . contribute[d] to continued detention or prosecution." Pls.' Opp'n at 11 ¶ 18.

**IV. CONCLUSION**

The Court concludes that (1) plaintiffs fail to state claims for kidnapping and fabrication of evidence; (2) plaintiffs fail to state Fourth Amendment claims against Lt. Louie White, Sgt. Wayne Tabb, Sgt. Kendrick Anderson, and Sgt. Gerald Rich, Jr.; and (3) Officer Tammie Artis, Officer Nigel Crawford-Kinney, and Officer Christian Anguisaca did not violate plaintiffs'

Fourth Amendment rights and therefore are entitled to qualified immunity. Defendants' motion is GRANTED. An Order is issued separately.

/s/
RUDOLPH CONTRERAS
United States District Judge

DATE: September 28, 2026